UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Civil Case 1:23-cv-20943-KMM MOORE/LOUIS

DON'T TREAD ON US, LLC, a Florida
limited liability company,

            Plaintiff,

v.

TWITTER, INC. a Delaware corporation,

            Defendant.

### DEFENDANT TWITTER, INC.'S MOTION TO DISMISS

Defendant Twitter, Inc. ("Twitter") moves to dismiss this action with prejudice.[1] Plaintiff Don't Tread On Us LLC's ("DTOU") breach of contract claim in this action relates to the suspension of two accounts associated with Jared H. Beck ("Mr. Beck") and Elizabeth Lee Beck ("Mrs. Beck") on Twitter's social networking service. (Dkt. 1-1 at *2-3 ¶ 3.) The subject Twitter accounts have been suspended since January 2019 and June 2019, and DTOU brings this action purporting to be the "assignee of all rights" held by Mr. and Mrs. Beck pursuant to their "contractual relationships with Twitter." (Dkt. 1-1 at *12, 14 ¶¶ 11, 18.)

While DTOU's Complaint recites pages of misguided beliefs as to why the accounts were suspended and should be reinstated, allegedly resulting in Twitter breaching a contract, it tellingly ignores the terms of the only operative contract at issue—Twitter's User Agreement—which obliterates DTOU's claim. *See* Twitter User Agreement, May 25, 2018 (Ex. 1) ("User Agreement"). The User Agreement plainly shows that none of the actions complained of

---

[1] Twitter is not waiving its transfer argument or the forum selection clause by timely moving to dismiss this action in order to preserve the arguments in this motion for dismissal.

1

can constitute a breach of contract, and that no rights could be assigned to DTOU in any event. In addition, the Communications Decency Act ("CDA") bars the breach of contract claim asserted in the Complaint. As such, this action should be dismissed *with prejudice.*

## BACKGROUND

Twitter operates a social media communication service that allows users to communicate through posts—called "tweets"—on the platform. Mr. and Mrs. Beck used Twitter accounts until January 2019 and June 2019, when the accounts were suspended. (Dkt. 1-1 at *12 ¶ 11.)

In order to use the platform, a user must agree to the terms of the User Agreement, which states that for all U.S. residents, "the Twitter User Agreement comprises [the hyperlinked] Terms of Service, [hyperlinked] Privacy Policy, the [hyperlinked] Twitter Rules and all incorporated policies.[2] *See* User Agreement (Ex. 1 at *1). The "Terms of Services ("Terms") govern [users'] access to and use of [Twitter's] services." (*Id.* at *2.) Mr. and Mrs. Beck accepted the terms of the User Agreement. (*Id.* at *2 ("By using the Services you agree to be bound by these Terms."), *8 ("By continuing to access or use the Services … you agree to be bound by the revised Terms .... These Terms are an agreement between you and Twitter ...")); (Dkt. 1-1 at *14 ¶ 21 ("Both Jared Beck and Elizabeth Lee Beck have valid and enforceable contracts with Twitter").)

While the User Agreement states that Twitter gives its users "a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software," it also states that:

> [t]his license has the sole purpose of enabling you to use and enjoy the benefit of the Services as provided by Twitter, in the manner as permitted by these Terms . . . [and] Nothing in these Terms gives you a right to use the Twitter name or any of

---

[2] A court can consider documents outside the four corners of the complaint on a motion to dismiss if the document is referenced in the complaint and central to plaintiff's complaint. *Janda v. T-Mobile USA, Inc.*, 378 Fed.Appx. 705, 707 (9th Cir. 2010); *Huete v. Bank of New York Mellon*, 17-CV-20371, 2017 WL 1499241, at *1 (S.D. Fla. Apr. 25, 2017). DTOU's Complaint alleges a breach of contract and specifically references the "contractual relationships with Twitter" of Twitter users. (Dkt. 1 at *14 ¶¶ 18, 20-26).

2

the Twitter trademarks, logos, domain names, and other distinctive brand features. *All right, title, and interest in and to the Services (excluding Content provided by users) are and will remain the exclusive property of Twitter and its licensors.*

*See* User Agreement (Ex. 1 at *6) (emphasis added). In addition, the User Agreement states that Twitter:

*may suspend or terminate your account or cease providing you with all or part of the Services at any time for any or no reason*, including, but not limited to, if we reasonably believe: (i) you have violated these Terms or the Twitter Rules or Periscope Community Guidelines . . .

(*Id.*) (emphasis added). Twitter may also:

"remove or refuse to distribute any Content on the Services, *suspend or terminate users, and reclaim usernames without liability to you*."

(*Id*. at *4 (emphasis added).) Finally, Twitter retained the ability to change its terms in the User Agreement:

We may revise these Terms from time to time. The changes will not be retroactive, and the *most current version of the Terms, which will always be at twitter.com/tos will govern our relationship with you*. We will try to notify you of material revisions, for example via a service notification or an email to the email associated with your account. By continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms."

(*Id*. at *8 (emphasis added).)

In January 2023,[3] Mr. and Mrs. Beck purported to assign all rights they had pursuant to the User Agreement to DTOU. (Dkt. 1-1 at *14 ¶ 18.) Subsequently, on January 20, 2023, DTOU commenced this action against Twitter alleging breach of contract. (Dkt. 1-1.)

The Complaint alleges that Twitter breached its contract with Mr. and Mrs. Beck because it has not restored the subject suspended accounts. (Dkt. 1 at *2-3, 14 ¶¶ 3, 24.) Specifically, DTOU alleges that a "tweet" by Elon Musk, Twitter's owner and CEO, somehow warranted the

---

[3] DTOU was only formed as of January 17, 2023, three days before this lawsuit was filed. (Dkt. 1-3.)

3

restoration of the subject accounts. (Dkt. 1-1 at *1, 13-14 ¶¶ 1, 14, 23.) Twitter's failure to "unsuspend" the subject accounts, DTOU alleges, therefore amounts to a breach of contract. Because the terms of the User Agreement make clear that there is no claim for breach of contract here, and it is otherwise barred by Section 230 of the CDA, the claim asserted in this action should be dismissed with prejudice.

## ARGUMENT

DTOU fails to state a claim for breach of contract because no such claim exists under the operative contract—the User Agreement—and the facts here. In addition, Section 230 of the CDA bars DTOU's effort to impose liability on Twitter for performing traditional editorial function with the suspension of the subject Twitter accounts.

Under Rule 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to set forth a set of facts that, if true, would entitle the plaintiff to relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court accepts the complaint's well-pleaded factual allegations as true and makes factual inferences in favor of the plaintiff, but the Court is not required to accept legal conclusions couched as factual allegations. *See Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1176 (9th Cir. 2021); *Strickland v. Astrue*, 2008 WL 11439364, at *1 (M.D. Fla. Sept. 16, 2008). Further, the Court is not required to accept conclusory allegations that are contradicted by the operative contract. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 990 (9th Cir. 2001); *Griffin Industries, Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007).

### I. Twitter's User Agreement Bars DTOU's Claim

The express contract at issue here and its terms foreclose DTOU's claim. The User Agreement explicitly allows for suspension—*for any or no reason*—and does not require

4

reinstatement. *See* User Agreement (Ex. 1 at *6). In addition, the purported assignment of rights to DTOU by Mr. and Mrs. Beck is explicitly prohibited under the User Agreement. (*Id*.) Therefore, the Court should dismiss DTOU's breach of contract claim.

### a. The User Agreement Specifically Allows Suspension Without Liability

DTOU's claim targets Twitter's alleged failure to reinstate accounts associated with Mr. and Mrs. Beck. But access to Twitter's platform was limited by agreement, and subject to Twitter's control. In the first instance, the User Agreement states that "All right, title, and interest in and to the Services (excluding Content provided by users) are and will remain the exclusive property of Twitter and its licensors." (*Id*. at *6.) Consequently, Mr. and Mrs. Beck had no right to own or operate their accounts.

Moreover, the User Agreement permits Twitter's right to modify, restrict, or remove Mr. and Mrs. Beck's access in at least three different places.

First, the User Agreement states that Twitter may "remove or refuse to distribute any Content" and "*suspend or terminate users ... without liability* to [user]." (*Id*. at *4 (emphasis added).) Second, it states that Twitter "may suspend or terminate your account or cease providing you with all or part of the Services at any time *for any or no reason*." (*Id*. at *6 (emphasis added).) Third, it also states that Twitter gives its users a non-exclusive license to use the software and "[n]othing in these Terms gives [users] a right to use the Twitter name or any of the Twitter trademarks, logos, domain names, and other distinctive brand features." *Id*. These provisions undeniably gave Twitter the right to suspend the subject accounts at its discretion or otherwise restrict use of Twitter's services, and without liability. *See Trump v. Twitter Inc.*, 602 F. Supp. 3d 1213, 1227 (N.D. Cal. 2022), *motion for relief from judgment denied,* 3:21-CV-08378-JD, 2023 WL 1997921 (N.D. Cal. Feb. 14, 2023) (stating the User Agreement "gave Twitter contractual

5

permission to act as it saw fit with respect to any account or content for any or no reason").

Likewise, there is no provision in the User Agreement that requires Twitter to reinstate any account. Thus, DTOU has no contractual basis to complain about Twitter's suspension of the subject accounts, let alone Twitter's refusal to "unsuspend" them. (Dkt. 1-1 at *14 ¶ 24.); *Trump*, 602 F. Supp. 3d at 1227. On the contrary, the User Agreement, which Mr. and Mrs. Beck agreed to be bound by, specifically allows Twitter to indefinitely suspend accounts. *See* User Agreement (Ex. 1 at *6) ("[Twitter] may suspend or terminate [the user's] account or cease providing [the user] with all or part of the Services at any time for any or no reason"). On this basis alone, DTOU's claim for breach of contract fails.

DTOU attempts to avoid the inevitable dismissal of its claim by pointing to a "tweet" by Twitter's CEO, Elon Musk, as somehow modifying the terms of the User Agreement. Specifically, DTOU alleges that Mr. Musk's "tweet" concerning "suspended accounts" entitles Mr. and Mrs. Beck to have the subject accounts reinstated, and Twitter's failure to do so is a breach of contract. (Dkt. 1-1 at *1, 14 ¶¶ 1, 23-24.) However, this claim is flawed, and again barred by the explicit terms of the User Agreement.

As users of the Twitter service, Mr. and Mrs. Beck were bound by the written terms of the User Agreement. *See* User Agreement (Ex. 1 at *2, 8 ("These Terms of Service govern your access to and use of our services..." and "the most current version of the Terms, which will always be at twitter.com/tos, will govern our relationship with you.")). Under California law, "when the parties have voluntarily expressed their agreement in written form, the writing represents a complete integration of their understanding" unless it is missing some essential term – which the User Agreement is not (nor is it alleged too). *Mangini v. Wolfschmidt*, Ltd. 165 Cal.App.2d 192, 198

(1958).[4] *See also Jenkins v. Eckerd Corp.*, 913 So. 2d 43, 53 (Fla. 1st DCA 2005) ("[a] written agreement represents the complete and exclusive instrument setting forth the parties' intended agreement."). As a result, the User Agreement is controlling and "all other utterances"—like DTOU's allegations about Mr. Musk's tweet—"are legally immaterial." *Cressey v. International Harvester Co. of America*, 206 F.29, 32 (9th Cir. 1913); *Gulf Atlantic Towing Corp. v. Dickerson, Inc.*, 271 F.2d 542, 546 (5th Cir. 1959).

As DTOU also alleges, "[t]he contracts with Twitter allow Twitter the right to revise or modify their terms." (Dkt. 1-1 at *14 ¶ 22.) However, DTOU's allegation that a tweet by Mr. Musk modified the terms of the User Agreement is contrary to the terms of the User Agreement. *See* User Agreement (Ex. 1 at *8). The User Agreement explicitly states that Twitter "may revise these Terms from time to time" and "the most current version of the Terms, which will always be at twitter.com/tos will govern our relationship with you." (*Id.*) The User Agreement also states "[w]e will try to notify you of material revisions, for example via a service notification or an email to the email associated with your account." *Id.* Mr. and Mrs. Beck agreed to these terms. *Id.* ("By continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms."). And no terms within the User Agreement allow for modification by "tweet" or anything other than the revision of terms in the User Agreement posted on Twitter's website.

Mr. Musk's tweet did not modify the User Agreement. There simply is no contractually binding term that would support DTOU's claim for breach of contract for Twitter's alleged failure to "unsuspend" the subject accounts, and the claim should be dismissed.

---

[4] The Terms of Services under the User Agreement provide that "The laws of the State of California, excluding its choice of law provisions, will govern these Terms." *See* User Agreement (Ex. 1 at *8.)

### b. The User Agreement Prohibits Assignment

The User Agreement explicitly states that "Twitter gives you a personal, worldwide, royalty-free, *non-assignable* and non-exclusive license to use the software provided to you as part of the Services." (*Id.* at *6 (emphasis added).) This provision prevents the assignment of any rights belonging to Mr. and Mrs. Beck relating to the use of Twitter's software to DTOU. *See, e.g.*, *Short v. Singer Asset Fin. Co. LLC*, 107 Fed. Appx. 738, 739 (9th Cir. 2004) ("[T]he [agreement's] anti-assignment clause deprived [plaintiff] of not only the right to make the assignment [], but also the power to do so. The parties' intention in this regard is clearly manifested by the plain language of the [agreement's] anti-assignment clause ... Because we find that [plaintiff] lack the power to assign her payments, her attempted assignment is null and void."); *Davidowitz v. Delta Dental Plan of Cal., Inc.*, 946 F.2d 1476, 1478 (9th Cir. 1991) ("As a general rule of law, where the parties' intent is clear, courts will enforce non-assignment provisions.") (citing Restatement (Second) of Contracts § 322); *Vardag v. Motorola, Inc.*, 264 F.Supp.2d 1056, 1061 (S.D. Fla. 2003) (Same).

Consequently, because the breach of contract claim in this action relates to a non-assignable license to use Twitter's software, DTOU's effort to sue for breach of contract as an assignee fails. DTOU's claim should be dismissed because DTOU cannot demonstrate a valid assignment.[5]

---

[5] The prohibition on assignment also means that DTOU should not have standing to pursue any claim, providing alternative grounds for dismissal of its claim. *See e.g. Pacific Shores Hosp. v. Backus Hosp. Med. Benefit Plan*, CV047935ABCPLAX, 2005 WL 8154685, at *3 (C.D. Cal. May 18, 2005) (granting motion to dismiss for lack of subject matter jurisdiction because hospital lack standing to pursue an action for benefits because the subscriber agreement governing the patient's health plan expressly prohibited assignments); *Long Beach Meml. Med. Ctr. v. California Mart Employee Benefit Plan*, 172 F.3d 57 (9th Cir. 1999) (finding that the district court did not err by concluding the medical center lacked standing because the non-assignment clause was valid under ERISA, but vacating on other grounds); *MSPA Claims 1, LLC v. Scottsdale Ins. Co.*, 352 F. Supp. 3d 1234, 1239 (S.D. Fla. 2018) (finding that plaintiff lacked standing because the assignment was not approved).

**II. Section 230 of the CDA Bars DTOU's Claim**

DTOU's claim should also be dismissed with prejudice because it is an attempt to hold Twitter, an interactive computer service provider, liable for Twitter's decisions concerning the removal of third-party content posted on Twitter's platform. Under well-established precedent, Section 230(c)(1) of the CDA bars all such claims. *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC,* 521 F.3d 1157, 1170–71 (9th Cir. 2008) ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230.").

District courts may (and routinely do) grant Rule 12(b)(6) motions on Section 230 immunity grounds and need not wait for that defense to be raised later. *See Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1096–97 (9th Cir. 2019). "[C]ourts aim to resolve the question of § 230 immunity at the earliest possible stage of the case so that defendants entitled to § 230 immunity are saved from having to fight costly and protracted legal battles." *Morton v. Twitter, Inc.*, 2021 WL 1181753, at *3 (C.D. Cal. Feb. 19, 2021) (quoting *Nemet Chevrolet, Ltd. v. Consumeraffirs.com, Inc.*, 591 F.3d 250, 254–55 (4th Cir. 2009)) (internal quotation marks omitted). Courts thus routinely dismiss claims with prejudice under Section 230. *See, e.g.*, *Fyk v. Facebook, Inc.*, 2019 WL 11288576, at *3 (N.D. Cal. June 18, 2019); *Morton*, 2021 WL 1181753, at *6; *Lewis v. Google LLC*, 461 F. Supp. 3d 938, 963 (N.D. Cal. 2020), *aff'd,* 851 F. App'x 723 (9th Cir. 2021).

Section 230(c)(1) of the CDA "protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat. . . as a publisher or speaker (3) of information provided by another information content provider." *Dyroff*, 934 F.3d at 1097 (citation omitted); *see* 47 U.S.C. § 230(c)(1) ("No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."). All three

9

prongs are met here, and DTOU's breach of contract claim thus falls squarely within this definition.

On Section 230(c)(1)'s first prong, Twitter is a provider of an interactive computer service. As the Ninth Circuit has held, "[t]he prototypical service qualifying for [CDA] immunity is an online messaging board (or bulletin board) on which Internet subscribers post comments and respond to comments posted by others." *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016). This aptly describes Twitter, a platform where account holders post content and engage with the content of other account holders. Courts have thus repeatedly found that Twitter is an "interactive computer service provider." *See, e.g., Brittain v. Twitter, Inc.*, 2019 WL 2423375, at *2 (N.D. Cal. June 10, 2019) (dismissing claim against Twitter with prejudice pursuant to § 230(c)(1)); *Dehen v. Does 1-100*, 2018 WL 4502336, at *3 (S.D. Cal. Sept. 19, 2018) (same); *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1120–22 (N.D. Cal. 2016) (same), aff'd, 881 F.3d 739 (9th Cir. 2018).

With regard to Section 230(c)(1)'s second and third prongs, the Complaint seeks to treat Twitter as a publisher of information provided by another information content provider, and the claim is thus barred. A plaintiff treats the defendant as a publisher when it attempts to hold a defendant liable for traditional editorial functions, including reviewing and deciding whether or not to publish content from third parties. *Roommates*, 521 F.3d at 1170–71. Here, DTOU's breach of contract allegations against Twitter all target Twitter for actions it took as a publisher in determining which individuals (and the content they produce) are allowed to remain on its platform.

The Ninth Circuit and district courts in California have held time and time again that Section 230(c)(1) bars suits like DTOU's, which seek to hold twitter and other social media platforms liable for "activity that can be boiled down to deciding whether to exclude material that third parties seek to post online." *See Roommates*, 521 F.3d at 1170–71. These courts (and others) have consistently found that plaintiffs who, like DTOU, challenge removal from social media platforms are in fact

challenging decisions that Section 230 immunizes from review. *See, e.g.*:

- *Brittain*, 2019 WL 2423375, at *3 ("Twitter argues that Brittain's claims 'ultimately arise from Twitter's alleged decision to suspend' the Brittain Accounts and therefore seek to treat Twitter as a publisher under the CDA. … The Court agrees with Twitter.");

- *Mezey v. Twitter, Inc.*, 2018 WL 5306769, at *1 (S.D. Fla. July 19, 2018) (dismissing claims with prejudice under section 230 where the plaintiff "seeks to hold Twitter liable for its exercise of an publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone or alter content.") (internal quotations omitted).

- *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1117 (N.D. Cal. 2020) (dismissing claims as precluded by 230(c)(1) where "Plaintiffs seek to hold Facebook liable for removing FAN's Facebook account, posts, and content");

- *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1095 (N.D. Cal. 2015) ("[R]emoving content is something publishers do, and to impose liability on the basis of such conduct necessarily involves treating the liable party as a publisher.") (citation omitted)), *aff'd*, 697 F. App'x 526 (9th Cir. 2017);

- *Riggs v. MySpace, Inc.*, 444 F. App'x 986, 987 (9th Cir. 2011) (social network's decision to delete some profiles but not others protected from liability by § 230(c)(1)).

Accordingly, the CDA bars DTOU's breach of contract claim: Twitter is an interactive computer service; the content was created by Mr. and Mrs. Beck; and DTOU seeks to hold Twitter liable for its traditional editorial functions such as deciding whether to publish or withdraw content. DTOU's claim should therefore be dismissed with prejudice. *See Fyk*, 2019 WL 11288576, at *3 ("[G]ranting leave to amend would be futile in this instance as Plaintiff's claims are barred" by § 230(c)(1)); *King v. Facebook, Inc.*, 572 F. Supp. 3d 776, 792 (N.D. Cal. 2021) (same).

## **CONCLUSION**

DTOU's claim for breach of contract is barred by terms of the very agreement it claims was breached, and is also barred by Section 230 of the Communications Decency Act. Because no claim exists to support this action, it should be dismissed with prejudice.

Dated: March 15, 2023                                                          Respectfully submitted,

/s/Joshua C. Webb
Joshua C. Webb (FBN: 051679)
josh.webb@hwhlaw.com
val.taylor@hwhlaw.com
HILL, WARD & HENDERSON, P.A.
101 E Kennedy Blvd., Suite 3700
Post Office Box 2231
Tampa, Florida 33601
(813) 221-3900 (Telephone)
(813) 221-2900 (Facsimile)
*Attorneys for Defendant*